# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

JANE DOE (J.T.A.), AN INDIVIDUAL

Plaintiff,

v.

WYNDHAM HOTELS & RESORTS, INC.;
WYNDHAM HOTEL GROUP, LLC;
RAMADA WORLDWIDE, INC.; and
QUEST AIRPORT HOTEL LLC,

Defendants.

CIVIL ACTION NO:

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Jane Doe (J.T.A.), Plaintiff in the above-styled and numbered cause, files this Original Complaint against WYNDHAM HOTELS & RESORTS, INC., WYNDHAM HOTEL GROUP, LLC; RAMADA WORLDWIDE, INC.; and QUEST AIRPORT HOTEL LLC, as Defendants, and would respectfully show the Court and jury as follows.

## SUMMARY

1.      Jane Doe (J.T.A.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or

coercion.[1] To "harbor" means to "give shelter or refuge to."[2] Traffickers or 'pimps', who use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will, often use hotels to harbor their victims.

3.      Some victims are brought into trafficking through abduction or use of physical violence, while many other trafficking relationships begin with a false promise of a romantic relationship or financial security.[3] Traffickers often prey on individuals with vulnerabilities that make them more susceptible to coercion and control.[4]

4.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for traffickers and sex buyers.

5.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.
[2] *Doe v. Hotels*, 6:23-CV-1012, 2024 WL 2955728, at *6 (M.D. Fla. June 12, 2024) (quoting Merriam-Webster Dictionary).
[3] The National Prevention Toolkit, Sex Trafficking, https://nationaltoolkit.csw.fsu.edu/leo/part-2/sex-trafficking
[4] Polaris Project, Sex Trafficking: The Basics, https://polarisproject.org/understanding-human-trafficking/

7.      As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (J.T.A.) with minimal risk of detection or interruption. Defendants continued supporting traffickers, including Jane Doe (J.T.A.)'s traffickers, despite evident and apparent signs of widespread and ongoing sex trafficking in these hotels. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## PARTIES

8.      Jane Doe (J.T.A.) is a resident of New York. She may be contacted through her lead counsel, whose information is contained below.

9.      J.T.A. is a victim of sex trafficking under 18 U.S.C. §1591(a) because she was harbored, transported, or provided for the purpose of causing her, through force, fraud, or coercion, to commit a commercial sex act.

10.      Given the nature of the allegations in this lawsuit, there is a collective and compelling interest in not publicly revealing the identity of J.T.A.

11.      Wyndham Hotels & Resorts, Inc., f/k/a Wyndham Worldwide Corporation ("WHR") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It may be served through its registered agent for service Corporate Creations Network Inc. at 1521 Concord Pike Suite 201, Wilmington, Delaware 19803. Defendant WHR is the successor entity to the hotel business of Wyndham Worldwide Corporation and its former subsidiaries. Defendant WHR is responsible, as successor, for all liabilities of Wyndham Worldwide Corporation and its predecessor subsidiaries related to franchising, controlling, and operating the Subject Ramada. All

references to WHR include the acts and omissions of predecessor entities for which WHR is responsible, including Wyndham Worldwide Corporation and its former subsidiaries.

12.     Wyndham Hotel Group, LLC ("WHG") is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. It can be served by its registered agent Corporate Creations Network Inc. at 1521 Concord Pike Suite 201, Wilmington, Delaware 19803. Upon information and belief, WHG is a wholly owned subsidiary of WHR and a former subsidiary of Wyndham Worldwide Corporation.

13.     Ramada Worldwide, Inc. ("Ramada") is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. It may be served through its registered agent for service Corporate Creations Network Inc. at 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803.

14.     All references to Ramada Worldwide, Inc. include any department, division, office, agency, subsidiary, corporate affiliate, predecessor corporation, or successor corporation, whether domestic, foreign, and/or international. The term also includes any director, officer, agent (either with direct/actual authority or implied/apparent authority), employee, person, firm, or corporation acting on behalf of Ramada Worldwide, Inc. now or at any time relevant to the claims herein.

15.     WHR, WHG, and Ramada are referred to collectively as the "Wyndham Defendants" or "Wyndham" or "Franchisor Defendants."

16.     Upon information and belief, the Wyndham Defendants, either directly or through the acts of predecessors for which they are responsible, owned, operated, controlled, and/or managed the hotel located at 7500 Augusta National Dr, Orlando, FL 32822 ("Subject Ramada").

17.     Quest Airport Hotel, LLC ("Quest") is a for-profit Florida limited liability company with its principal place of business in Florida. Quest may be served through its registered agent for

service MEHTA, DINYAR DMGRM at 898 FLORIDA PARKWAY KISSIMMEE, FL 34743. At all relevant times, Defendant Quest owned the Subject Ramada. Quest will be referred to as a "Franchisee Defendant."

<u>**JURISDICTION AND VENUE**</u>

18.     This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more Defendants reside in this district and all Defendants are residents of New Jersey for purpose of venue under 28 U.S.C. §§ 1391(c).

20.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the District of New Jersey.

21.     All Wyndham Defendants have the same principal place of business, which is in Parsippany, New Jersey, within the District of New Jersey. Corporate activities related to the operation of the Subject Ramada occurred at this New Jersey headquarters, and documents related to the Subject Ramada are stored and maintained at this New Jersey headquarters.

22.     Plaintiff's claims against the Franchisee Defendant arise out of Franchisee Defendant's contacts with New Jersey through it franchising relationship with the Wyndham Defendants. These franchising relationships were centered at the Wyndham Defendants' principal place of business in the District of New Jersey. Franchisee Defendant's participation in a venture with the Wyndham Defendants operating its respective hotel occurred, in substantial part, in New Jersey. For example:

- Upon information and belief, Franchisee Defendant actively sought out a franchising relationship by contacting the Wyndham Defendants in New Jersey.

5

- The franchising agreement had a choice of law provision selecting the law of New Jersey as the governing law.

- Franchisee Defendant agreed to resolve all disputes with the Wyndham Defendants by mediation, arbitration and/or litigation in New Jersey.

- Franchisee Defendant agreed to submit all notices required under the franchising agreement to the Wyndham Defendants in New Jersey.

- The Wyndham Defendants dictated rules and policies related to operation of the Subject Ramada, including those related to safety, security, human trafficking, employee training and response, from their principal place of business in New Jersey.

- Franchisee Defendant was required to submit regular reports regarding financial performance, guest satisfaction, and operational matters to the Wyndham Defendants' corporate offices in New Jersey.

- The rules and policies that the Wyndham Defendants adopted required Franchisee Defendant to report information to their headquarters in New Jersey, including information about all incidents involving safety, security, public relations, or serious injury to persons or property that occur at, or involve, the Subject Ramada, including those involving sex trafficking victims like Jane Doe (J.T.A.).

- Franchisee Defendant had an ongoing obligation to participate in centralized programs operated by the Wyndham Defendants from their principal place of business in New Jersey.

- Franchisee Defendant utilized centralized customer feedback and complaint resolution system managed by the Wyndham Defendants from New Jersey, and the Wyndham Defendants and Franchisee Defendant coordinated efforts to analyze and respond to guest feedback.

- Franchisee Defendants' employees received training and operational guidelines from the Wyndham Defendants, with key training materials being developed and distributed from New Jersey, particularly in the areas of safety and anti-trafficking protocols. Upon information and belief, Franchisee Defendant was required to attend training in New Jersey.

- Reservation information for rooms at the Subject Ramada passed through a system operated and managed by the Wyndham Defendants from their principal place of business in New Jersey.

- Payment information for rooms at the Subject Ramada passed through a system operated and managed by the Wyndham Defendants in New Jersey.

- The benefit that Franchisee Defendant received from room rentals was governed by a New Jersey franchising agreement.

- Franchisee Defendant agreed to make all payments due under the franchising agreement at the Wyndham Defendants' principal place of business in New Jersey.

- Franchisee Defendant's operation of the Subject Ramada was controlled and/or influenced by many policies set and enforced by the Wyndham Defendants from their principal place of business in New Jersey.

- Franchisee Defendant was required to purchase insurance for the New Jersey-based Wyndham entities related to operation of the Subject Ramada.

23.     Upon information and belief, Franchisee Defendant contractually consented to jurisdiction in the District of New Jersey.

## FACTS

### I.    Jane Doe (J.T.A.) is a Survivor of Unlawful Sex Trafficking at the Hotel Owned, Operated, Managed, and Controlled by Defendants.

24.     Jane Doe (J.T.A.) was trafficked through force, fraud and coercion by her traffickers to engage in numerous commercial sex acts. Jane Doe (J.T.A.) had multiple traffickers in the years she was trafficked. Her traffickers used physical violence, psychological abuse and manipulation, overt threats of violence to Jane Doe (J.T.A.) and her family, a pattern of threatening and intimidating conduct, fraudulent promises of a romantic relationship/financial stability, exploitation of financial dependence, exploitation of dependence on illegal drugs, extreme restrictions on Jane Doe (J.T.A.)'s freedom, restraints on Jane Doe (J.T.A.)'s freedom of movement, extreme isolation, and coercive control  to require her to engage in commercial sex for their financial benefit, including at the Subject Ramada.

25.     Jane Doe (J.T.A.) first came under the control of her traffickers in 2012. These traffickers worked together to traffic Jane Doe (J.T.A.) and other victims. She remained under the continuous control of these traffickers until at least the end of 2015.

26.     At various times between 2013 to 2015, Jane Doe (J.T.A.) was continuously and unlawfully trafficked at the Subject Ramada. Jane Doe (J.T.A.) was trafficked through force, fraud, and coercion by her traffickers and required to engage in numerous commercial sex acts for their financial benefit.

27.     Jane Doe (J.T.A.)'s sexual exploitation repeatedly occurred in rooms of the Subject Ramada and was facilitated by the Wyndham Defendants and Franchisee Defendant.

28.     During the period that she was trafficked at the Subject Ramada, Jane Doe (J.T.A.)'s trafficking had profound effects on her, including effects on her appearance, demeanor, movements throughout the hotel, and her interactions with others. This manifested in signs of Jane Doe (J.T.A.)'s trafficking that were obvious and apparent to the staff at the Subject Ramada. These effects were obvious to the staff and management of the hotels where she was trafficked, including effects on Jane Doe (J.T.A.)'s appearance, demeanor, movements throughout the hotel, and her interactions with her traffickers, hotel staff, and others. These signs included visible injuries on her face and body, nervous and fearful demeanor, signs of paranoia, disorientation, refusal to make eye contact, limited access to clothing, appearing under the influence of illegal drugs, inability to move around the hotel or communicate with others, submissive behavior with her traffickers, lack of personal possessions, and signs of sleep deprivation and poor hygiene.  These signs matched "red flags" of trafficking that the hotel industry and each Defendant recognized to be indicators of sex trafficking in a hotel environment.

29.     There were obvious signs that Jane Doe (J.T.A.) was being trafficked at the Subject Ramada such that the Wyndham Defendants and Franchisee knew or, through the exercise of reasonable diligence should have known, that they were participating in a venture causing her sexual exploitation.

30.    At relevant times, Franchisee owned, operated, and managed the Subject Ramada and employed the staff at the Subject Ramada through the franchising system of the Wyndham Defendants.

31.    At all relevant times, the Wyndham Defendants were directly involved in the relevant operations of the Subject Ramada and exercised systemic control over Franchisee with respect to operation of the Subject Ramada such that Franchisee was the Wyndham Defendants' actual agents for operation of the Subject Ramada. The Wyndham Defendants also retained control over aspects of the operations of the Subject Ramada directly related to the claims of Jane Doe (J.T.A.).

32.    The traffickers of Jane Doe (J.T.A.) and other sex traffickers frequently used Wyndham branded hotels for sex trafficking with approval, acquiescence, and/or implicit support of Defendants and their employees and agents, including the staff of the Subject Ramada named herein.

## II.    The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.

33.    The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Wyndham Defendants knew or should have known regarding the trafficking at their hotel properties, the specific trafficking activity that resulted in the trafficking of Jane Doe (J.T.A.) was pervasive and apparent at the Subject Ramada named herein.

34.    Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[5] For years, sex traffickers have been able to reap their profits with little

---

[5] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019),https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

risk when attempting to operate within hotels.[6] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[7] Hotels have been found to account for over 90% of the commercial exploitation of children.[8]

35.    Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.[9]

36.    Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT, among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[10] This resulted in the development of "red flags" of sex trafficking. Law enforcement agencies and other organizations with subject-matter expertise identified specific

---

[6]   *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

[7]   Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[8]   *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

[9]   *See, e.g.*, Department of Homeland Security, *Blue Campaign Toolkit*, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, *Child Sex Trafficking Overview*, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, *Red Flags for Hotel and Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

[10]   United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

indicators of the presence of sex trafficking at a hotel. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel. These recurring indicators are known as "red flags" of sex trafficking.

37.    Recognized "red flags" of sex trafficking that are considered general indicators of trafficking that can be observed by staff throughout a hotel[11] include:

- individuals who appear to be with a significantly older "boyfriend" or in the company of much older males;
- a group of girls who appears to be traveling with an older female or male;
- a group with similar tattoos, which can indicate "branding" by a trafficker;
- individuals showing fear, anxiety, tension, submissiveness and/or nervousness;
- individuals who seem disoriented;
- individuals showing signs of physical abuse;
- individuals showing signs of restrain or confinement;
- individuals showing signs of malnourishment, poor hygiene, fatigue, or sleep deprivation;
- individuals with signs of untreated illness or injuries;
- individuals who appear to lack freedom of movement;
- individuals who are being constantly monitored and/or escorted around the hotel;
- individuals who avoid eye contact;
- individuals who avoid interactions with others;
- individuals who are not in possessions of their own identification;
- individuals who have few or no personal possessions;
- individuals who dress provocatively;
- a high volume of men who are not registered guests entering and exiting a room; and
- individuals who wait in common areas while other men frequent the room.

38.    Recognized "red flags" of sex trafficking that can be detected by front-desk staff and hotel security[12] include:

- patrons appeared distressed at check-in;
- the same person reserving multiple rooms;

---

[11] *See id.*
[12] *See id.*

- rooms paid for with cash or prepaid cards;
- rooms are paid for one day at a time;
- requests for isolated rooms or rooms close to an exit;
- use of hotel computers for adult oriented or sexually explicit websites;
- patrons not forthcoming about identifying information when registering;
- individuals checking in but then leaving a room only infrequently, not at all, or at odd hours;
- individuals lack identification;
- car in the parking lot is parked so license plate is not visible;
- individual present who avoids eye contact, does not communicate, and is accompanied by someone else who appears to speak for them; and
- individual appears to be giving scripted responses.

39.     Recognized "red flags" of sex trafficking that can be detected by housekeeping, maintenance, and room service staff[13] include:

- constant use of the "Do Not Disturb" sign;
- requests for housekeeping services (towels, linens, etc.) but denying staff entry into the room;
- refusal of cleaning services for multiple days;
- excessive amounts of cash in a room;
- presence of multiple computers, cell phones, pagers, or other technology;
- the same person reserving multiple rooms;
- individuals leaving the room infrequently, not at all, or at unusual hours;
- individuals loitering in hallways or appearing to monitor a room;
- excessive alcohol in a room;
- illegal drugs in a room;
- evidence of pornography;
- excessive number of people staying in a room;
- guests with few or no personal possessions in room;
- provocative clothing and shoes;
- constant flow of men into a room at all hours; and excessive amounts of sex paraphernalia in rooms.

40.     The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex

---

[13] *See id.*

trafficking.[14]  From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

41.    The organizations who developed these "red flags," then educated and trained the hotel industry about them. For example, the United States Department of Homeland Security's Blue Campaign initiative issued specific guidance to the United States hotel industry through a "Hospitality Toolkit" describing human trafficking warning signs that could be detected by various categories of hotel staff. [15]

42.    Before Jane Doe (J.T.A.)'s trafficking at the Subject Ramada, each Defendant was educated and trained on these "red flags" of sex trafficking. The organizations that developed these "red flags" identified them as indicators specific to sex trafficking in a hotel environment. At all relevant times, each Defendant acknowledged and recognized these "red flags" specifically as signs of sex trafficking and instructed and trained their staff to identify and investigate them as signs of sex trafficking when observed in the hotel.

43.    The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[16] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

---

[14] Department of Homeland Security, *Blue Campaign Toolkit*,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[15] / Department of Homeland Security, Blue Campaign Toolkit,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.;
www.doj.state.wi.us/sites/default/files/ocvs/human%20trafficking/Hospitality%20Toolkit%20-%20English%20-
%20Wisconsin%20AG%20Office%281%29.pdf
[16] *See, e.g., A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*,
https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

44.    The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants may attempt to draw a distinction between commercial sex or prostitution and sex trafficking, but they have long understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[17]

45.    All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of that hotel.

46.    There were also well-established practices for hotels to avoid the facilitation of sex trafficking. For example, End Child Prostitution and Trafficking ("ECPAT-USA") has identified hotel-specific best practices for preventing sex trafficking, such as (1) not permitting cash payments; (2) requiring vehicle information and photo id at check-in; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly and blocking websites frequently used to advertise commercial sex on hotel Wi-Fi; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number; and (8) developing a protocol for response to indicia of trafficking activity.[18]

---

[17] *Id.*
[18] https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_AntiTraffickingHotelChecklist.pdf

47.     The most effective weapon against sexual exploitation and human trafficking is education and training.[19]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[20]

48.     This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[21]   In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

49.     Given the prevalence of sex trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking necessary steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

---

[19] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).
[20] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.
[21] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

50.     Each of the Wyndham Defendants and Franchisee had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to "red flags" of sex trafficking.

51.     Unfortunately for Jane Doe (J.T.A.), the Wyndham Defendants and Franchisee have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (J.T.A.).

III.    **Sex Trafficking Has Long Been Prevalent at Defendants' Hotel Properties, and Defendants Have Known About It.**

52.     Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (J.T.A.)'s trafficking, that sex trafficking was ongoing and widespread at Wyndham branded properties including the property where Jane Doe (J.T.A.) was trafficked.

A.  **Sex Trafficking at Wyndham Branded Hotels was well Known by Wyndham Defendants.**

53.     Upon information and belief, each of the Defendants monitored criminal activity occurring at Wyndham branded hotels and were aware of activity indicating commercial sex, sex trafficking and/or related crimes occurring at those branded hotels, including the specific hotel property where Jane Doe (J.T.A.) was trafficked.

54.     Upon information and belief, at all relevant times Wyndham has adopted a centralized approach to trafficking-related issues at all its branded properties. Wyndham's public statements confirm that it knew sex trafficking was a problem at its hotels and that it retained control over the response of its branded hotels to sex trafficking. Wyndham has recognized it has

16

a "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[22] It has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[23] However, Wyndham has refused to publish reports to show its progress on the EPCAT goals to combat sex trafficking in hotels.[24]

55.    Unfortunately, while Wyndham's statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[25]

56.    The problem of sex trafficking at Wyndham branded properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotels from supporting child sex exploitation at Wyndham properties. Although the Wyndham brand publicly committed to take steps to stop facilitating trafficking, this promise proved empty; the Wyndham brand has been named a "major contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[26]

57.    In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[27]

---

[22] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[23] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[24] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023
[25] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")
[26] https://endsexualexploitation.org/wyndham/
[27] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/

58.     Information that has become public through news stories establishes the entrenched and pervasive nature of Wyndham hotels' role in providing a venue where sex trafficking has continued unabated for years. Upon information and belief, Wyndham Defendants and Franchisee monitored news stories and online reviews for indicia of criminal activity, including sex trafficking. Examples of news stories confirm the widespread presence of sex trafficking, prostitution, and related criminal activity at Wyndham branded hotels include:

- In June 1987 a federal grand jury indicted 16 persons on charges stemming from alleged participation in an interstate prostitution ring working out of hotels including a Rockville, Maryland Ramada Inn.[28]

- In September 2009, police discovered a prostitution ring at the Ramada Inn on Roosevelt Boulevard in Philadelphia. Police looking for a defendant in a drug case discovered 11 women. Some of the women reported that they were being held against their will and sexually assaulted.[29]

- In May 2010, Waterloo, Iowa Police followed used a Craigslist ad and made arrangements to meet females for sex at the local Ramada Inn. Police arrested two.[30]

- In February 2010, police in Burbank, California arrested three at the Ramada Burbank Airport Hotel on charges of prostitution as part of their effort to curb the sex trade.[31]

- In June 2012 Beaverton, Oregon police made an arrest at a Ramada Inn Northeast Portland in connection with a nationwide FBI sex trafficking sting.[32]

---

[28] Victoria Churchville, 16 INDICTED IN PROSITUTION RING THAT USED PAGERS, POSH HOTELS, The Washington Post, (June 19, 1987), https://www.washingtonpost.com/archive/local/1987/06/19/16-indicted-inprostitution-ring-that-used-pagers-posh-hotels/c984c86e-6ecf-42ee-bb55cbc980dab948/
[29] Possible prostitution ring discovered at Boulevard Ramada, WHYY PBS (Sept. 8, 2009), https://whyy.org/articles/possible-prostitution-ring-discovered-at-boulevardramada/
[30] Police make Prostitution Arrests, Waterloo Police Department, https://www.waterloopolice.com/press-release/654-police-make-prostitutionarrests.html
[31] Olsen Ebright, Burbank Hookers, Beware, NBC 4 Los Angeles, (Mar. 3, 2010), https://www.nbclosangeles.com/news/local/burbank-prostitution/1867548/
[32] Beaverton police arrest two in nationwide, FBI sex trafficking sting, The Oregonian, (Jun. 26, 2012), https://www.oregonlive.com/beaverton/2012/06/beaverton_police_arrest_two_in.html

- In July 2012, East Hartford's "Hot Spot Unit" conducted a sting at the Ramada Inn on Roberts Street in Hartford, Connecticut where it arrested a man for promoting prostitution and 6 women on charges of prostitution.[33]

- In January 2013 two women were arrested on suspicion of prostitution at the Ramada Inn Burbank in Burbank, CA.[34]

- In April 2013, police found an underage girl in a room where prostitution was believed to be occurring at a Tampa, Florida Ramada Inn. A twenty five-year-old woman fled the scene. She was later arrested on charges of procuring a person under 18 for the purpose of prostitution, deriving support from the proceeds of prostitution and renting space to be used for prostitution.[35] She was later convicted of charges of trafficking three underage teens, including a 16-year-old girl and a 14-year-old boy.[36]

- In November 2013, an investigation into prostitution ring, led to the arrest of five people and the seizure electronic equipment at the Ramada Inn in La Vergne, Tennessee.[37]

- In March 2014, undercover police raided a room at the Ramada Inn on Roosevelt Boulevard in Philadelphia arresting a woman for solicitation of prostitution and a man for suspected drug dealing.[38]

- In April 2014, police in Rock Hill, North Carolina, as part of a prostitution sting that netted five, made arrests at the Ramada Inn. In total the arrests included three women and two men.[39]

---

[33] East Hartford Police Arrest Seven on Prostitution Charges, Harford Courant, (Jul. 26, 2012), https://www.courant.com/community/hartford/hc-xpm-2012-07-27-hceast-hartford-prostitution-arrests-0728-20120727-story.html

[34] Two women arrested on suspicion of prostitution at Burbank Ramada Inn, Burbank Leader (Feb. 1, 2013), https://www.latimes.com/socal/burbank-leader/the818now/tn818-0201-two-women-arrested-on-suspicion-of-prostitution-at-burbank-ramada-innstory.html

[35] Kristin Weber, Woman accused of recruiting minor for prostitution, 10 Tampa Bay, (Apr. 2, 2013), https://www.wtsp.com/article/news/local/woman-accused-ofrecruiting-minor-for-prostitution/67-326688993

[36] Dan Sullivan, Tampa woman gets 15 years in prison for recruiting teens for prostitution, Tampa Bay Times, (Nov. 11, 2016), https://www.tampabay.com/news/courts/criminal/tampa-woman-gets-15-years-in-prison-for-recruiting-teens-for-prostitution/2302520/

[37] Marie Kemph, Police: Drugs seized in prostitution ring raid, Murfreesboro Post, (Nov. 27, 2017), https://www.murfreesboropost.com/news/police-drugs-seized-inprostitution-ring-raid/article_5ed959b6-fe72-52ee-bcc8-401c8f28d986.html

[38] Undercover cops make prostitution, drug arrests Northeast Times (Mar. 20, 2014), https://northeasttimes.com/2014/03/20/undercover-cops-make-prostitution-drugarrests/

[39] Five arrested in prostitution sting at two Rock Hill motels, police say, WBTV, (Apr. 24, 2014), https://www.wbtv.com/story/25330215/five-arrested-in-prostitutionsting-at-two-rock-hill-motels-police-say/

- In June 2014, the mother of a mentally ill woman who police say was killed after meeting for sex at a Ramada Inn in College Park, Maryland said her daughter was mentally ill and was pimped by men via computer ads.[40]

- In September 2014, police in Parsippany, New Jersey – the same city Wyndham maintains its principal place of business - arrested a man and a woman in at a Ramada Inn only 12 minutes from Wyndham's corporate office on charges of theft and prostitution.[41]

- In March 2015, police arrested a woman who was renting a room at the Ramada Inn in Wayne, New Jersey for prostitution.[42]

- In April 2015, a woman was arrested on prostitution and drug charges by an undercover police officer in a sting at a Whitehall, Pennsylvania Ramada Inn.[43]

- In August 2015, at least 20 people were arrested in a prostitution sting conduced at a Des Moines, Iowa Ramada by Wyndham as part of an operation that began as a result of complaints from local business owners and citizens.[44]

- In December 2015 Hanover County, North Carolina District Attorney issued an admonishment to a Ramada Inn on Market Street, Wilmington, North Carolina, among others, for, "repeated acts which create and constitute a breach of the peace, including but not limited to prostitution, assaults, fights, and discharging firearms."[45]

- In February 2016, a Franklin, Tennessee Police Department used Backpage.com as part of a sting operation that lead to the arrest of a woman at the Ramada Inn on charges of prostitution, and possession of drug paraphernalia.[46]

---

[40] Darcy Spencer, Mother of Motel Murder Victim: "She's Not a Prostitute," 4 Washington, (Jun. 8, 2014), https://www.nbcwashington.com/news/local/mother-ofmotel-murder-victim-denies-daughter-was-a-prostitute/59771/

[41] William Westhoven, Stolen purse at Kmart leads to prostitution bust, Daily Record, (Sept. 7, 2014), https://www.dailyrecord.com/story/news/local/2014/09/07/stolenpurse-kmart-leads-prostitution-bust/15192421/

[42] Natalie Mieles, Prostitution Arrest Made N Wayne Hotel, Patch, (Mar. 23, 2015), https://patch.com/new-jersey/wayne/prostitution-arrest-made-wayne-hotel-0

[43] Manuel Gamiz, Jr., Woman faces prosecution, drug charges after sting at Whitehall hotel, The Morning Call, (Apr. 23, 2015), https://www.mcall.com/news/breaking/mcc-whitehall-hotel-prostitution-arrest-20150423-story.html

[44] Grant Rodgers and Kim Norvell, More arrests as prostitution stings continue, Des Moines Register, (Aug. 19, 2015), https://www.desmoinesregister.com/story/news/crime-and-courts/2015/08/19/urbandale-businessman-charged-prostitution/31987431/

[45] DA, police chief focus on motel crime on Market Street, Star News Online, (Jan. 10, 2016), https://www.starnewsonline.com/story/news/2016/01/10/da-police-chieffocus-on-motel-crime-on-market-street/30994128007/

[46] Zach Harmuth, Nolensville Woman Arrested in Prostitution Sting Awaits Court, Williamson Source, (Feb. 5, 2016), https://williamsonsource.com/nolensville-womanarrested-prostition-sting-awaits-court/

59.    These articles are only representative examples. There are many similar articles about sex trafficking and other associated criminal activity at Wyndham branded hotels. Moreover, on information and belief, the Wyndham Defendants are aware of additional significant law enforcement activity related to trafficking at their hotels that was not reported in the media.

60.    Based on information and belief, the Wyndham Defendants and Franchisee Defendants managed and monitored on-line reviews of Wyndham hotel locations. Examples of reviews reflecting indica of sex trafficking and related criminal activity include:

- In December 2007 regarding the Ramada Inn in Toms River, New Jersey, in a review titled, "Hookers, Drugs, and poor service," a reviewer wrote "[a]s my wife and I went to our room, we were first asked for money from some guy in the hallway, then a prostitute informed us for a fee, she would join us…."[47]

- In February 2010 regarding the Ramada by Wyndham in Rochelle Park, New Jersey, a reviewer wrote, "[t]hin walls, so EVERYTHING was heard, especially when some pimp was yelling & cursing at his "employee" from 1am till 4 am. The clientele were mostly thugs & onenight-standers."[48]

- In September 2010 regarding the Ramada by Wyndham Pikesville/Baltimore North, a customer complained, "[a]nd to top it all off, we were awakened at 2 AM by a large party of about 25 young people outside the room, some of whom were apparently prostitutes--young girls in skimpy clothes talking to men through car windows."[49]  The General Manager replied but did not address the prostitution complaint.

- A November 2010 review regarding a Ramada in Seattle, Washington states "Basically if you like Prostitutes and Drug Dealers this is your place, The place is managed by a Very Young Arrogant Manager and his response to my complaints was everyone deserves a second chance, not to mention the noise."[50]

---

[47] https://www.tripadvisor.co.uk/ShowUserReviews-g46870-d98468-r11235472-Ramada_by_Wyndham_Toms_River-Toms_River_New_Jersey.html
[48] https://www.tripadvisor.com/ShowUserReviews-g46782-d92577-r55266477-Ramada_by_Wyndham_Rochelle_Park_Near_ParamusRochelle_Park_New_Jersey.html
[49] https://www.tripadvisor.com/ShowUserReviews-g41317-d250631-r80299255-Ramada_by_Wyndham_Pikesville_Baltimore_North-Pikesville_Maryland.html
[50] https://www.tripadvisor.com/Hotel_Review-g58732-d224851-Reviews-Ramada_by_Wyndham_SeaTac_Airport-SeaTac_Washington.html

- A June 2011 review of a Ramada Inn in Costa Mesa, CA states "Wow this "hotel" is horrible…We were on the 3rd floor which was the quietest. Swore we saw 2-3 prostitutes walking around outside."[51]

- An October 2011 review of a Ramada in Bangor, ME states "About 1 in the morning there was a group of drunk people in the hallways running up and down the halls and slamming doors. I called the front desk and they said they would send someone up to check on it, however, the slamming continued for over an hour and a half. I also saw a man bringing a prostitute to his room down the hall where they had a "noisy" encounter."[52]

- A September 2011 review regarding a Ramada Inn in Reno, Nevada states "One word... EEWWWWW! Hookers are outside courting truck drivers. Meth heads are going in and out the doors looking for thier next fix. Desk man wasnt anywhere to be found for check-in."[53]

- In October 2011 regarding the Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[w]as there any prostitution at the hotel? Maybe. But the pimps in the lobby always held the door for us…."[54]

- A May 2012 review of a Ramada in Denver, CO states "Definitely not safe as we witnessed actual drug deals and sex trade going on in back. The front desk staff was too busy flirting with each other to be helpful."[55]

- In June 2012 regarding the Ramada by Wyndham in East Orange, New Jersey, in a review titled, "It Is As Bad As They Say," a reviewer wrote, "[v]isible prostitutes going up and down the hall."[56]

- In September 2012 regarding the Ramada by Wyndham in Wyndham's home town of Parsippany, New Jersey, a reviewer advised, "[p]lease avoid this hotel at all costs unless you're a trucker or prostitute."[57]

---

[51] https://www.yelp.com/biz/ramada-by-wyndham-costa-mesa-newport-beach-costa-mesa

[52] https://www.tripadvisor.com/Hotel_Review-g40502-d93532-Reviews-Bangor_Grande_Hotel_Conference_Center-Bangor_Maine.html

[53] https://www.yelp.com/biz/ramada-by-wyndham-reno-hotel-and-casino-reno

[54] https://www.tripadvisor.com/ShowUserReviews-g46403-d92370-r119573653-Ramada_by_Wyndham_East_Orange-East_Orange_New_Jersey.html

[55] https://www.tripadvisor.com/Hotel_Review-g33388-d85325-Reviews-Ramada_by_Wyndham_Denver_Downtown-Denver_Colorado.html

[56] https://www.tripadvisor.com/ShowUserReviews-g46403-d92370-r132718173-Ramada_by_Wyndham_East_Orange-East_Orange_New_Jersey.html

[57] https://www.tripadvisor.com/ShowUserReviews-g46715-d98515-r141158336-Ramada_by_Wyndham_Parsippany-Parsippany_Morris_County_New_Jersey.html

- An October 2012 review of a Ramada Inn in Gainesville, FL states "Do NOT stay here. In disrepair, dirty, and a hub for drugs and prostitution. Hotels.com should not represent this hotel."[58]

- In November 2012 regarding the Ramada Limited in Cockeysville, Maryland, a reviewer wrote, "seems to be mainly a place for hooker hookups and not somewhere anyone actually stays."[59]

- A November 2012 review of a Ramada in Portland, Oregon states "First of all this place is disgusting. It is full of pimps and hoes and DRUGS:/."[60]

- In March 2013 regarding the Ramada by Wyndham Baltimore West in Baltimore, Maryland, a reviewer, in a review titled "Prostitute plaza," wrote, "[o]ur second evening we were confronted by ladies who were at the time selling themselves to us. As we walked to our car the next morning we were once confronted again by 2 different professional women advancing sexual and in appropriate verbiage to my 18 year old son."[61]

- A March 2013 review of a Ramada Inn in Bowling Green, Kentucky states "I noticed a woman wearing over the knee leather boots standing in front of the hotel, after I had checked in. She was obviously waiting to be "picked up"…If you are looking for hookers, this is the place to go!"[62]

- In August 2013 regarding Ramada by Wyndham West Atlantic City in Atlantic City, New Jersey, a reviewer reported, "a load of police cars because there was a prostitution raid…." The hotel's webmaster replied saying they appreciated the review and observations.[63]

- In September 2013 regarding the Ramada by Wyndham in Yonkers, New York, a reviewer complained, "[a]ll night…drugs and prostitution business is going on there with the knowledge of the staff and managers…."[64]

---

[58] https://www.expedia.com/Gainesville-Hotels-Motel-6-Gainesville.h918788.Hotel-Reviews
[59] https://www.tripadvisor.com/ShowUserReviews-g41075-d93714-r146214352-Ramada_Limited_Cockeysville-Cockeysville_Maryland.html
[60] https://www.tripadvisor.com/Hotel_Review-g52024-d96118-Reviews-Ramada_by_Wyndham_Portland_Airport-Portland_Oregon.html
[61] https://www.tripadvisor.co.nz/ShowUserReviews-g41045-d93846-r154472777-Ramada_by_Wyndham_Baltimore_West-Catonsville_Maryland.html
[62] https://www.tripadvisor.com/Hotel_Review-g39214-d92797-Reviews-Ramada_by_Wyndham-Bowling_Green_Kentucky.html
[63] https://www.tripadvisor.com/ShowUserReviews-g46742-d98115-r174159963-The_Ramada_Atlantic_City_West-Pleasantville_New_Jersey.html
[64] https://www.tripadvisor.com/ShowUserReviews-g48922-d93875-r175810200-Ramada_by_Wyndham_Yonkers-Yonkers_New_York.html

- In February 2014 regarding the Ramada by Wyndham in East Orange, New Jersey, a concerned citizen reported, "[t]here is also a revolving door of prostitution going on at the Ramada Inn" in East Orange, New Jersey on a message board.[65]

- A March 2014 review of a Ramada Inn in Reno, Nevada states "As I entered the hotel I immediately noticed the type of clients they have. I seriously think is like a pimp/prostitute warehouse."[66]

- An April 2014 of a Ramada in Alpharetta, GA states "The manager checked me in and on my way to the suit, two ladies drunk, smoking at the elevator, went into room and room was smelling old, a/c was not working effectively, no proper lighting in the room, after a while I went to sleep and some one came knocking on the door at abt 2 AM in the night, I was scared and looked through eye piece from the door, a man (supposedly a pimp) and a girl were just knocking all the doors to ask if anyone wants to have sex with that lady, I then called the desk and no one bothered to answer my cal.....waited, calmly went back to bed! later, that morning, complained about the incident and the desk manager doesn't respond properly, poor communication....I wont recommend this to anyone!!!"[67]

- In May 2014 regarding the Ramada by Wyndham Baltimore West, in Baltimore, Maryland a reviewer reported, "[a] big complaint was what appeared to be a prostitute going in and out of the room next to ours every45 minutes or so and having relatively loud sex all night."[68]

- In November 2014 regarding the Ramada by Wyndham Waukegan/Great Lakes in Waukegan, Illinois, a reviewer noted, "I encountered the back door propped open on several occasions and different men pulling up in numerous vehicles, staying for a half hour or less each time. I called the front desk and reported this and was told the one man security would handle it. He didn't. Condoning prostitution is grounds for business license revocation or suspension." Regarding prostitution, the Manager replied, "We never condone any illegal activities, have overnight security to assure the peace of all our guests, and cooperate fully with local law enforcement immediately should we encounter any illegal activities."[69]

---

[65] https://seeclickfix.com/issues/928962-dangerous-elevator-ramada-inn
[66] https://www.yelp.com/biz/ramada-by-wyndham-reno-hotel-and-casino-reno
[67] https://www.tripadvisor.com/Hotel_Review-g35235-d123989-Reviews-Ramada_by_Wyndham_Alpharetta-Roswell_Georgia.html
[68] https://www.tripadvisor.co.nz/Hotel_Review-g41045-d93846-Reviews-Ramada_by_Wyndham_Baltimore_West-Catonsville_Maryland.html
[69] https://www.tripadvisor.com/ShowUserReviews-g36854-d90331-r239174515-Ramada_by_Wyndham_Waukegan_Great_LakesWaukegan_Lake_County_Illinois.html

- A June 2015 review of a Ramada Inn in Manchester, Tennessee states "The place looked pretty bad but when I went to the door of my room, I realized that there were pimps and their 'ladies' hanging out around the doorways. I went into my room and eventually pulled the bed cover back and got a big surprise. There was blood all over the sheets! Someone had bled on the bed and then pulled the sheet back over itâ€¦probably very soon before I checked into this hotel.  When I complained to the front desk clerk about it, she affected not to know what was going on and complained about my attitude. She didn't like it that I was mad about hookers bleeding all over the bed I was supposed to sleep in.  She said she had no idea that this was going on, that she was just the clerk wink, wink. Unless you are a customer for prostitutes, avoid this place like the plague."[70]

- In a July 2015 review of a Ramada by Wyndham in East Orange, New Jersey, a reviewer wrote, "[o]n the way back to our room, my husband heard a prostitute making "deals" with her clients. The foot traffic is heavy within this hotel, and now it makes sense. If you're looking for a prostitute, then this is the place to be, but this is not a family friendly hotel."[71] The General Manager replied but did not address the concerns regarding prostitution.

- In August 2015 regarding the Ramada by Wyndham Parsippany in Wyndham's home town of Parsippany, New Jersey, a reviewer titled their review, "Do NOT Feel SAFE Here Anymore-- has Become a HOTSPOT for Prostitution!!-," and wrote, "FIRST ALL DOORS Of the Hotel are "Open" to ANYONE walking from the Streets…Arriving back to my Room one evening at 1A, watching cars parking, then Various men Walking Right into the hotel. When I Went into End main door), I Was Absolutely Scared to Death Noticing a Man Crouched down Behind The STAIRS!!!! "Obviously Waiting His Turn" Hearing him Say "I am here". "I am Inside". The TRAFFIC Coming and Going Just that ONE NIGHT Was unbelieveablofe. It Became OBVIOUS That PROSTITUTION Had Become Quite POPULAR At This Hotel, It Was like a "Rats Nest", Men Walking in all hours, Men sitting in their Cars ALL HOURS. It Was a Very Shameful, and Disturbing Sight. I Did Not Feel SAFE I Did Not Feel Respected by the Hotel, I Was Very Saddened to See What has happened  to this place!!!! I Actually Sat in my Car one evening at 11:30PM, literally Saw 7 Vehicles pull into parking lot, they would park, Men walking straight into the HOTEL!!! I Sat for about 20 minutes was All, Seeing All the Weird Men Coming and Going It was A Very CREEPY experience, it was Very Disturbing to me. You Don't have to be a Genius to See what is going on There…It is Hard to Believe that The Hotel is Allowing this type of Illegal Activity, These prostitutes are "Running Their Business" Selfish behavior and Non-Caring. The Hotel is CREEPY Now, ALL WEIRD MEN Coming and Going…The Ramada

---

[70] https://www.tripadvisor.com/Hotel_Review-g55181-d104564-Reviews-Quality_Inn-Manchester_Tennessee.html
[71] https://www.tripadvisor.com/ShowUserReviews-g46403-d92370-r294451091-Ramada_by_Wyndham_East_Orange-East_Orange_New_Jersey.html

REPUTATION has certainly Changed for the WORSE. The Prostitution at the Hotel is Bringing WEIRD, CREEPY, LOW-CLASS people, If I WANTED A HOTEL With prostitution, With NO LOCKS on the Doors, With NO SECURITY, Random Men Hiding under stairway, Walking Around inside All hours, I Could get That in Newark. This Whole Place Has Become SHAMEFUL…I Don't Recommend it for Anyone, Unless you are a "JOHN" Wanting a Good Time!!!!"[72]

- In September 2015 regarding the Ramada by Wyndham Parsippany in Wyndham's home town of Parsippany, New Jersey, a reviewer titled their review, "ALL I SAW Was Hookers, (And to Make it More Interesting, TRANS-SEXUAL MEN Who WERE PROSTITUTES)," and wrote, "…the LOCKS ARE ALL BROKEN and ANYONE CAN JUST WALK INSIDE THE BUILDING, NO SECURITY, NO LOCKS … I Think That 75% of the people Were prostitutes, and Everyone that I Saw parking and going inside Were Not GUESTS at the hotel, I Find it very Hard to believe That there is NO MANAGEMENT Seeing this activity…DRUGS, Hookers, It was AWFUL!!!!!"[73]

- In November 2015 regarding the Ramada Hotel & Conference Center by Wyndham in Edgewood, Maryland a reviewer titled their review, "Hookers bad WiFi and smelly room."[74] The General Manager replied as to the other issues raised, but ignored the prostitution complaint.

61.    This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (J.T.A.) was trafficked at the Subject Ramada, the Wyndham Defendants knew or should have known that:

a.    There was widespread and ongoing sex trafficking occurring at Wyndham branded properties;

b.    Sex trafficking was a brand-wide problem for Wyndham originating from management level decisions at their corporate offices in New Jersey;

c.    Wyndham franchisees and hotel staff were not taking reasonable steps to deter, detect, and disrupt known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties;

---

[72] https://www.tripadvisor.com/ShowUserReviews-g46715-d98515-r302891589-Ramada_by_Wyndham_Parsippany-Parsippany_Morris_County_New_Jersey.html
[73] https://www.tripadvisor.com/ShowUserReviews-g46715-d98515-r313180289-Ramada_by_Wyndham_Parsippany-Parsippany_Morris_County_New_Jersey.html
[74] https://www.tripadvisor.com/ShowUserReviews-g41125-d89414-r325336267-Ramada_Hotel_Conference_Center_by_Wyndham_EdgewoodEdgewood_Maryland.html

    d.  Wyndham's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective; and

    e.  Wyndham and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

62.     Despite the mounting evidence that sex trafficking at their properties was ongoing and growing, Wyndham Defendants and Franchisee Defendant chose to earn revenue by continuing conduct that they knew or should have known would facilitate that trafficking.

**B.  The Wyndham Defendants and Franchisee had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Ramada.**

63.     Sex trafficking was widespread and pervasive at the Subject Ramada specifically.

64.     The Wyndham Defendants and Franchisee knew or should have known about the sex trafficking pervasive at their respective Subject Ramada based on obvious indicators of this activity.

65.     Internet reviews for the Subject Ramada, which upon information and belief Wyndham Defendants and their respective Franchisee manage and monitor, show the pervasiveness of sex trafficking before and well after Jane Doe (J.T.A.) was trafficked. For example:

- A 2011 review states "I'm not sure but I think they might be renting by the hour because all i could hear all night through the paper thin walls was a woman moaning. The peep hole was broken and plugged with a straw wrapper. I only found this out because when my friend came to the door and i loooked out they jokingly put their finger to the peeplhole and it poked me in the eye. Bathtub looks like a prison shower and the linens are clearly from a 70's porn.... all in all dont rent here it's dated and nasty.....also i would like to again stress the awful smell....[75] The general manager responded to this review.

- A 2015 review states "I stayed in the Ramada for a month while I was attending training for my new job. HORRIBLE hotel…Lots of prostitutes coming in and out of the hotel…

---

[75]https://www.tripadvisor.com/Hotel_Review-g34515-d87966-Reviews-Ramada_by_Wyndham_Suites_Orlando_Airport-Orlando_Florida.html

We had tons of issues with this hotel…
-Room Doors Not closing and/or locking properly
-Prostitutes Coming in and out of the hotel constantly
The list goes on and on…I would NEVER EVER stay in this hotel or recommend it to anyone especially someone with a family, if you are staying here and have small kids, be ready to explain to your kids who these skimpy ladies are walking in and out of rooms at all hours of the day and also be ready to have the worst sinus problems due to the mold in the rooms.[76]

- A 2020 review titled "Dirty and Allows Prostitutes" states "We spent three nights here with our two children. Immediately we realized booking this hotel was a BIG mistake… The lowest point was when I was approached by a prostitute in the lobby. She seemed perfectly comfortable being in the lobby and was on a first name basis with the desk attendant."[77]

- A 2023 review states "This place is not what I expected. Rooms are outdated, not comfortable at all. It's very old building and just tried to throw some paint on the walls. Hotel smells from old smoking. It's a place you just don't feel clean in. Like a place where people show up have sex and leave. Just wasn't a place I would ever want to go back too. The breakfast was decent and lobby looked okay. Everything else nope."[78]

66.    Defendants knew that a population of traffickers, including Jane Doe (J.T.A.)'s traffickers, repeatedly chose to use their respective Subject Ramada for their sex trafficking activity. They selected the hotel because of policies and practices that created a favorable environment for trafficking and because hotel staff turned a blind eye to signs of trafficking. These traffickers followed a repetitive and routine procedure during stays at the Subject Ramada. There were obvious signs of this activity, which were consistent with the well-known "red flags" for sex trafficking in the hospitality industry. As such, Defendants also knew or should have known about the pervasive sex trafficking at their respective Subject Ramada location based on obvious indicators of this activity.

---

[76]https://www.tripadvisor.com/Hotel_Review-g34515-d87966-Reviews-
Ramada_by_Wyndham_Suites_Orlando_Airport-Orlando_Florida.html
[77] https://www.tripadvisor.com/Hotel_Review-g34515-d87966-Reviews-
Ramada_by_Wyndham_Suites_Orlando_Airport-Orlando_Florida.html
[78] https://www.google.com/maps/place/?q=place_id:ChIJeyGRTBBj54gRg2_dLKOGhVw&source=mc

67.     These traffickers, including J.T.A.'s traffickers, operated with little regard for concealment, due to an implicit understanding between Defendants and the traffickers. This understanding enabled the traffickers to operate openly, as they had found a venue where they could conduct their operations without disruption from Defendants.

68.     Upon information and belief, there were other victims being trafficked at the Subject Ramada at the same time as J.T.A., and there were obvious signs these victims were being trafficked.

69.     Based upon information and belief, the conduct of Defendants facilitated the trafficking of multiple victims by multiple traffickers at their respective Subject Ramada. Defendants developed a continuous business relationship with these traffickers who operated at the hotels on a routine and repetitive basis.

70.     Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Subject Ramada prior to Jane Doe (J.T.A.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who not registered guests in and out of their room at unusual times, and other signs consistent with the "red flags" of trafficking identified above. Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice that these victims were being subject to violence, coercion, control, and exploitation.

71.     All knowledge from the staff at the Subject Ramada is imputed to the respective Franchisee, which employed the hotel staff. Thus, Franchisee knew about the widespread and

ongoing trafficking at the Subject Ramada, including the trafficking of Jane Doe (J.T.A.), through the direct observations of hotel staff, including management-level staff. This knowledge is further imputed to the Wyndham Defendants based on the existence of an actual agency relationship as described below.

72.     In addition to available public sources of information about trafficking and knowledge imputed from the hotel staff and management, Franchisee Defendant learned or should have learned about the obvious signs of widespread trafficking at its hotel, based on non-public sources of information including but not limited to:

- surveillance of the property;

- internal investigations;

- customer complaints;

- monitoring of customer feedback;

- information received from law enforcement;

- and other sources of non-public information available to Franchisee.

73.     Upon information and belief, the Wyndham Defendants knew or should have known about the widespread trafficking at the Subject Ramada based on the tools they used to monitor and oversee the hotel. The tools they used included:

a.  The obligation of hotel staff and franchisee to report suspected criminal activity, including sex trafficking, to the Wyndham Defendants;

b.  The Wyndham Defendants' regular monitoring of online reviews;

c.  The Wyndham Defendants' collection and monitoring of customer surveys and complaints;

d.  The Wyndham Defendants' requirement that franchisee submit regular and detailed reports to the Wyndham Defendants about day-to-day hotel operations;

e. The Wyndham Defendants' collection and monitoring of data about guests at the Subject Ramada, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data;

f. The Wyndham Defendants' supervision and control over day-to-day operations of the Subject Ramada location through detailed information and extensive reports that it obtained through the property management system and other software systems it required franchisee to use and through which franchisee was obligated to allow the Wyndham Defendants to obtain real-time data to allow it to monitor hotel operations on a day-to-day basis;

g. The Wyndham Defendants' regular inspections of the Subject Ramada;

h. The Wyndham Defendants' employment of "field agents" to work with hotels on security issues, including trafficking issues;

i. The Wyndham Defendants' access to surveillance and security systems;

j. Information provided to the Wyndham Defendants by law enforcement; and

k. Other sources of information available to the Wyndham Defendants.

74. The Wyndham Defendants required hotel staff, management, and franchisees to report suspected criminal activity at the Subject Ramada, including suspected sex trafficking, to the Wyndham Defendants.

75. Based on the obvious "red flags" of sex trafficking at the Subject Ramada, Franchisee Defendant and the staff and management of the Subject Ramada were required to, and upon information and belief did, report numerous instances of suspected sex trafficking to the Wyndham Defendants before and during Jane Doe (J.T.A.)'s trafficking.

76. Upon information and belief, before and during Jane Doe (J.T.A.)'s trafficking, the Wyndham Defendants observed obvious "red flags" of numerous instances of sex trafficking occurring at the Subject Ramada based on their supervision and monitoring of the property.

**C. Defendants knew Jane Doe (J.T.A.) was being trafficked at the Subject Ramada because of the apparent and obvious "red flags" of sex trafficking.**

31

77.     During the period that Jane Doe (J.T.A.) was trafficked at the Subject Ramada, there were obvious signs that her traffickers were engaged in sex trafficking:

- Jane Doe (J.T.A.) was sometimes present with her traffickers during check-in.
- Other victims were also sometimes present with Jane Doe (J.T.A.) and her traffickers during check-in.
- Rooms were paid for with prepaid cards.
- Hotel staff would observe that Jane Doe (J.T.A.) arrived with few or no personal possessions.
- Jane Doe (J.T.A.)'s traffickers often yelled at her within earshot of hotel staff.
- Jane Doe (J.T.A.) was often forbidden from moving freely about the hotel.
- Hotel staff observed that Jane Doe (J.T.A.) was confined to her room for extended periods of time.
- It was apparent that Jane Doe (J.T.A.)'s traffickers were monitoring her constantly.
- Hotel staff observed Jane Doe (J.T.A.) dressed provocatively.
- When the hotel, staff observed Jane Doe (J.T.A.), she appeared emotional, nervous, and scared.
- When the hotel staff observed Jane Doe (J.T.A.) it was apparent she was under the influence of illegal drugs, which her traffickers used to control her.
- Jane Doe (J.T.A.)'s traffickers forced her to solicit clients at the hotel, including in the lobby and in parking lot, areas that were observed by hotel staff.
- Jane Doe (J.T.A.) was forced to see multiple johns per day. These individuals, who were not registered hotel guests, entered and left at unusual hours and were present at the hotel for brief periods of time.
- When Jane Doe (J.T.A.) was in her room seeing johns, her traffickers would sometimes be lingering in common areas of the hotel where they were observed by hotel staff.
- The "Do Not Disturb" door hanger was used very frequently.
- Housekeeping staff was usually prevented from entering the room for regular cleaning, towel exchange, and other standard room services.
- Jane Doe (J.T.A.) used an excessive number of linens and towels.
- When hotel staff did enter Jane Doe (J.T.A.)'s room, they would observe that she and other victims had few or no personal possession in the room.
- When hotel staff did enter Jane Doe (J.T.A.)'s room, they would observe excessive amounts of sex paraphernalia like condom wrappers and lubricant.

- When hotel staff did enter Jane Doe (J.T.A.)'s room, they would observe illegal drug paraphernalia.
- When hotel staff did enter Jane Doe (J.T.A.)'s room they would observe excessive amounts of cash that her traffickers kept there.
- When Jane Doe (J.T.A.)'s traffickers moved on from the Subject Ramada, they made no effort to clean the room and would leave excessive amounts of sex and drug paraphernalia.
- Other obvious signs of trafficking consistent with the modus operandi of her traffickers and which included well known "red flags" for trafficking in a hotel.

78.    Based upon information and belief, multiple employees at the Subject Ramada, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

79.    As such, Franchisee knew or was willfully blind to the fact that Jane Doe (J.T.A.) was being trafficked at the Subject Ramada.

80.    Given these obvious signs, the Wyndham Defendants knew or should have known about the trafficking of Jane Doe (J.T.A.) based on their policies or protocols that required hotel staff to report suspected criminal activity including sex trafficking.

81.    The Wyndham Defendants also knew or should have known about the trafficking of Jane Doe (J.T.A.) based on the numerous tools, described above, through which they monitored and supervised the Subject Ramada. The "red flags" of Jane Doe (J.T.A.)'s trafficking at this hotel were sufficiently obvious that, during the numerous times she was trafficked at this hotel, they were readily detectable through the oversight tools that the Wyndham Brand Defendant used.

82.    The Wyndham Defendants and Franchisee had constructive knowledge of the trafficking of J.T.A. at the Subject Ramada because that trafficking was the direct result of the Wyndham Defendants and Franchisee facilitating trafficking at the Subject Ramada.

83.    Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham branded hotels, and at the Subject Ramada, the Wyndham Defendants and Franchisee

each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the Subject Ramada and to make a reasonable investigation in response to signs of potential sex trafficking. If the Wyndham Defendants and Franchisee had used reasonable prudence, they would have been aware of Jane Doe (J.T.A.)'s trafficking at the Subject Ramada and that they were benefiting from such trafficking.

**IV.  Defendants actively facilitated sex trafficking at the Subject Ramada, including the trafficking of Jane Doe (J.T.A.)**

**A. Franchisee Defendant facilitated the trafficking activity at their Subject Ramada, including the trafficking of J.T.A.**

84.    Franchisee Defendant is responsible for the acts, omissions, and knowledge of employees of the Subject Ramada property when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Franchisee Defendant ratified these acts and omissions, and because Franchisee Defendant failed to exercise reasonable care with regard to the hiring, training, and supervision of their employees given the specific risks, known to Franchisee, of human trafficking occurring in the Subject Ramada.

85.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Ramada, Franchisee Defendant continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

86.    Franchisee Defendant knew or was willfully blind to the fact that J.T.A. was being trafficked at the Subject Ramada and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate J.T.A.'s sexual exploitation.

87.    Franchisee also facilitated widespread trafficking at the Subject Ramada, including the trafficking of J.T.A., in ways including:

a. developing relationships with traffickers, including J.T.A.'s traffickers, and creating an understanding that these traffickers could operate at their hotel without risk of interference;

b. continuing to provide rooms, services, and assistance to traffickers in the face of obvious "red flags" of trafficking of J.T.A. and other victims at the Subject Ramada;

c. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining their front-line staff regarding issues related to human trafficking;

d. inadequate and inadequately enforced sex trafficking notice and training for their hotel staff;

e. failing to contact law enforcement despite obvious indicia of criminal activity, including sex trafficking, occurring at the Subject Ramada;

f. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by their hotel staff;

g. providing rooms at the Subject Ramada location in a designated area of the property allowing ease of access for "johns" but also minimizing risks of detection; and

h. accommodating specific requests made by traffickers at the Subject Ramada.

88.    Franchisee Defendant's acts and omissions, which were motivated by a single-minded focus on profit-maximization, showed serious indifference to and callous disregard for the rights of sex trafficking victims, including Jane Doe (J.T.A.).

89.    Franchisee Defendant knew that sex trafficking causes immeasurable harm to victims and, nonetheless, knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue by facilitating that trafficking at the Subject Ramada.

**B.  The Wyndham Defendants facilitated the trafficking of Jane Doe (J.T.A.)**

90.     Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Ramada, Wyndham Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims.

91.     Wyndham Defendants knew or were willfully blind to the fact that Jane Doe (J.T.A.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (J.T.A.)'s sexual exploitation.

92.     Wyndham Defendants participated directly in aspects of the operation of the Subject Ramada that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Jane Doe (J.T.A.), as follows:

    a.  The Wyndham Defendants have publicly assumed responsibility and control over the human trafficking response of all Wyndham properties, including the Subject Ramada, including design and implementation of practices to prevent trafficking, safety and security procedures, employee and franchisee education, training, and response, partnership with external organizations, and advocacy;

    b.  The Wyndham Defendants retained control over when its branded hotels would share information with law enforcement and when law enforcement would be contacted about suspected criminal activity in Wyndham branded hotels, such as the Ramada hotels;

    c.  The Wyndham Defendants retained control over the response to trafficking by creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking to the Wyndham Defendants. The Wyndham Defendants determined when issues should be escalated to the National Human Trafficking Hotline or law enforcement;

    d.  The Wyndham Defendants retained control over determining which hotels needed additional training or other resources based on a high risk of human trafficking and other related criminal activity;

    e.  The Wyndham Defendants expressly retained control to terminate hotel staff and/or a franchising agreement based on the response to human trafficking;

    f.  The Wyndham Defendants retained control, at the brand-wide level, over training on how to spot the signs of and help prevent human trafficking. The Wyndham Defendants determined whether the training is provided, when it is provided, the

36

content of the training, how the training is delivered, who receives the training, and the consequences if someone does not participate in the training or fails to follow such training;

g.  Although they delayed making any reasonable effort to do so, the Wyndham Defendants acknowledge that they retain control to adopt requirements for franchised hotels specifically designed to prevent human trafficking and other criminal activity;

h.  The Wyndham Defendants maintain a Safety & Security Team and a Critical Incident Rapid Response Team that are charged with investigating and responding to potential criminal incidents at all Wyndham properties, including suspected trafficking incidents;

i.  The Wyndham Defendants are responsible for adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking at the Subject Ramada;

j.  The Wyndham Defendants maintained control over all details of the terms under which franchised hotels, including the Subject Ramada, offered internet services to customers, including dictating the software, hardware, and service provider to be used, setting all policies about use and restrictions on use, and actively collecting and monitoring guest internet usage data. The Wyndham Defendants dictated whether sites frequently used to solicit clients for sex trafficking victims would be accessible through the internet at the Subject Ramada;

k.  The Wyndham Defendants retained control over the setting, supervision, overseeing, and enforcement of detailed policies and protocol for housekeeping services at the Subject Ramada, including policies for how often rooms must be entered, how to respond to guest refusals of entry into rooms, and steps to monitor guest safety issues through housekeeping services; and

l.  The Wyndham Defendants collected, maintained, and analyzed detailed data regarding housekeeping services at the Subject Ramada, including trends that would reveal patterns consistent with human trafficking.

93.  Wyndham directly participated in and retained day-to-day control over renting rooms at all the Subject Ramada by, among other things:

a.  The Wyndham Defendants controlled all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b.  The Wyndham Defendants directly made reservations for rooms at the Subject Ramada and accepted payment for those rooms through a central reservation system that they controlled and operated. The Wyndham Defendants could reserve rooms and accept payments without requiring franchisee approval or involvement;

c.  The Wyndham Defendants established and maintained control over a brand-wide "do not rent" system. The Wyndham Defendants set all policies related to use of this system and dictated the day-to-day details of reservations at the Subject Ramada through detailed policies that it established regarding use of this "do not rent" system;

d.  The Wyndham Defendants controlled room rates, required discounts, mandatory fees, and rewards program;

e.  The Wyndham Defendants controlled and restricted the ability of franchisee and staff to refuse or cancel a reservation;

f.  The Wyndham Defendants controlled and oversaw policies and procedures regarding check-in, payment, and identity verification procedures;

g.  The Wyndham Defendants collected, retained, monitored, and analyzed detailed data about every guest who stayed at the Subject Ramada;

h.  The Wyndham Defendants established detailed policies and protocol that dictated, step-by-step, everything that would happen from the time a guest arrived at the Subject Ramada until they entered their guest room. This included operational directives regarding payment methods, identification requirements, the number of guests that could be in each room and whether information needed to be collected for each guest, what questions hotel staff should and should not ask, and other matters related to check-in; and

i.  The Wyndham Defendants required franchisees to use Wyndham's property management system, which was owned, maintained, controlled, and operated by the Wyndham Defendants, for virtually all aspects of hotel operations regarding room reservations and payment.

94.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Ramada named herein, Wyndham continued renting rooms to traffickers, including the rooms used to traffic victims, including Jane Doe (J.T.A.)

95.    Wyndham knew or should have known that Jane Doe (J.T.A.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (J.T.A.)'s sexual exploitation.

96.    The Wyndham Defendants formed a business relationship with traffickers at the Subject Ramada by renting rooms, collecting guest data, and operating the hotel in a way that

attracted business from traffickers and allowed them to operate efficiently with minimal risk of detection or traceability.

97.     Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Ramada, the Wyndham Defendants continued participating in a venture at this hotel, with its franchisee and hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to by the following:

   a. The Wyndham Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

   b. The Wyndham Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

   c. The Wyndham Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at their properties;

   d. The Wyndham Defendants implicitly approved decisions by franchisees and hotel staff not to report or respond to criminal activity including sex trafficking appropriately;

   e. The Wyndham Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at the Subject Ramada;

   f. The Wyndham Defendants attracted traffickers by affirmatively creating a favorable venue where access was easy, risks of interference were low, and traceability was minimal;

   g. Despite having specific knowledge of policies that would significantly reduce sex trafficking at its branded locations including the Subject Ramada, the Wyndham Defendants declined to implement policies that would likely have the effect of reducing its sex-trafficking related profits or that would require publicly acknowledging the ongoing problem of sex trafficking at its properties;

   h. The Wyndham Defendants willfully delayed taking obvious and apparent steps to stop facilitating sex trafficking, which they had the ability and responsibility to take sooner;

   i. The Wyndham Defendants allowed traffickers to reserve rooms using cash, which provided relative anonymity and non-traceability; and

j. The Wyndham Defendants provided traffickers with access to internet services in a manner that the Wyndham Defendant knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

98. If Wyndham Defendants had exercised reasonable diligence when operating Subject Ramada and in the areas where they retained control, Wyndham Defendants would have prevented the Subject Ramada from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (J.T.A.). Instead, Wyndham Defendants engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (J.T.A.).

**V.    Defendants' Ventures at the Subject Ramada**

99. Franchisee Defendant and the Wyndham Defendants benefited from use of the Subject Ramada for sex trafficking. Jane Doe (J.T.A.)'s traffickers and other traffickers rented rooms at the Subject Ramada and used the hotel to harbor, maintain, and provide victims including Jane Doe (J.T.A.). When these traffickers rented rooms, both the respective Franchisee Defendant and the Wyndham Brand Defendants received a financial benefit.

100. Each Franchisee Defendant generated revenue every time a sex trafficker rented a room at the Subject Ramada, both from room rental fees and from fees for other hotel services

101. Each of the Wyndham Brand Defendants generated substantial income from operations of hotels such as the Subject Ramada. In exchange for providing the services described above, each of the Wyndham Brand Defendants received a share of the revenue from room rentals collected at the Subject Ramada. The fees generated by the Wyndham Brand Defendants are primarily based on gross room rentals; therefore, the Wyndham Brand Defendants' revenue increase with each room rental at the Subject Ramada. Revenue generated from rooms rented at the Subject Ramada was distributed among the Wyndham Brand Defendants, with each benefiting from each rental of a hotel room by traffickers.

102.    The Wyndham Brand Defendants also benefited from sex traffickers' frequent use of the Subject Ramada because this regular and routine use of those hotels increased the hotel occupancy rate, and an increase in the hotel occupancy rate resulted in several benefits for the Wyndham Brand Defendants, including that this assisted them in obtaining financing and helped them market franchising opportunities to potential franchisees.

103.    In ways described more fully above, the Wyndham Defendants and Franchisee Defendant knowingly received a financial benefit from participating in a venture in the form of a continuous business relationship and implicit understanding with the traffickers operating out of the Subject Ramada, including Jane Doe (J.T.A.)'s traffickers. (hereinafter "Venture 1").

104.    The Wyndham Defendants and Franchisee Defendant formed this continuous business relationship and implicit understanding with the traffickers at the Subject Ramada by continuing to rent rooms to be used for trafficking (including Jane Doe (J.T.A.)'s trafficking) after the Wyndham Defendants and Franchisee Defendant knew or should have known that the rooms were being used for unlawful trafficking.

105.    This business relationship involved mutual pursuant of financial benefit: the traffickers were renting the hotel rooms to generate revenue from sex trafficking and the Wyndham Defendants and Franchisee Defendant were generating revenue by renting the hotel rooms.

106.    This implicit understanding developed because sex traffickers, including Jane Doe (J.T.A.)'s traffickers, frequently used the Subject Ramada for their trafficking knowing that staff members would look the other way. This occurred because of the acts and omissions of the Wyndham Defendants and Franchisee Defendant that created a favorable environment for sex trafficking to flourish. Multiple traffickers operated at the hotel, and multiple victims were harbored, provided, and exploited at the hotel.

107.    Both the Wyndham Defendants and the Franchisee Defendant participated in this venture by acting jointly to rent rooms to traffickers and to operate the hotel in a way that attracted business from traffickers and facilitated their trafficking activity. As further described above, Franchisee Defendant provided "boots on the ground" at its respective hotel, and the Wyndham Defendants played a primary role in renting rooms at the Subject Ramada and retained control over and was directly involved in aspects of hotel operations related to sex trafficking.

108.    The Wyndham Defendants and Franchisee Defendant participated in the venture by continually renting rooms to traffickers, including Jane Doe (J.T.A.)'s, after they knew or should have known that victims like Jane Doe (J.T.A.) were being subjected to unlawful trafficking. They also continued operating the hotel in a way that they knew or should have known would encourage traffickers to select the Subject Ramada as venues for their illegal activities.

109.    The Wyndham Defendants and Franchisee Defendant did not only provide these traffickers with a physical space (harboring) where they could imprison victims and sell them "johns" (providing), but they also provided these traffickers with the cover of a legitimate business as a venue where they could profit from sexual exploitation with a low risk of disruption. This was done pursuant to an implicit agreement with traffickers, which is evidenced by, among other things:

   a.  These traffickers reduced their operating burden because they did not need to make significant efforts to conceal their activities from the staff at the Subject Ramada but, instead, freely made requests that would facilitate their trafficking activities without concern for detection or interference by the staff;

   b.  Defendants allowed traffickers to take steps that would minimize their traceability to law enforcement, such as accepting cash payments and not requiring identification from appropriate parties; and

   c.  Defendants provided additional services to traffickers (including Jane Doe (J.T.A.)'s trafficker), including but not limited to, internet access, excessive towels, and extra housekeeping services to clean the activities of the trafficking venture once the traffickers vacated the rooms.

110.    The criminal traffickers operating at the Subject Ramada as part of Venture 1 violated 18 U.S.C. §1591 as to victims including Jane Doe (J.T.A.)

111.    If Wyndham Defendants and Franchisee Defendant had not continued participating in a venture that they knew or should have known engaged in violations of the TVPRA, they would not have received a benefit from J.T.A's trafficking at the Subject Ramada.

112.    In ways described more fully above, the Wyndham Defendants and Franchisee Defendant also knowingly received a financial benefit from participating in a commercial hotel-operating venture at the Subject Ramada (hereinafter "Venture 2").

113.    The Wyndham Defendants had a longstanding business relationship with the Franchisee Defendant pursuant to which they jointly participated in operation of the Subject Ramada with a shared goal of maximizing revenue, including gross room revenue.

114.    The Wyndham Defendants and Franchisee Defendant, through their respective roles in hotel operations as described above, facilitated widespread sex trafficking at the Subject Ramada by continuing to operate the hotel in a way that they knew or should have known resulted in them benefiting from significant sex trafficking occurring on site at this hotel.

115.    Venture 2 was engaged in a violation of the TVRPA through the widespread sex trafficking at the Subject Ramada, which resulted in Jane Doe (J.T.A.) and other victims being harbored, maintained, and provided in the rooms of the Subject Ramada. Venture 2 also engaged in a violation of the TVPRA through the actions of the Franchisee Defendant who violated the TVPRA as perpetrators by harboring sex trafficking victims as defined by 18 U.S.C §1591(a)(1) and by participating in a criminal trafficking venture as defined by 18 U.S.C §1591(a) (2).

116.    Despite their actual or constructive knowledge that Venture 2 was engaged in violations of 18 U.S.C. §§ 1591(a) and 1595(a), the Wyndham Defendants and Franchisee

Defendant participated in the venture by continuing to operate the Subject Ramada in a way that they knew or should have known would lead to further violations of 18 U.S.C. §1591, including the trafficking of Jane Doe (J.T.A.). The Wyndham Defendants provided Franchisee Defendant with operational support, use of trademarks, marketing services, and other resources to operate the Subject Ramada in a way that they knew or should have known was engaging in violations of 18 U.S.C §1591(a).

## VI.    Franchisee Defendant and the Staff at the Subject Ramada Acted as Actual Agents of Wyndham

117.    Wyndham Defendants are vicariously liable for the acts, omissions, and knowledge of Franchisee Defendant and staff at the Subject Ramada, which are Wyndham Defendants' actual agents or subagents.

118.    The Wyndham Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Ramada through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Defendants as they oversaw and supervised hotel operations at the subject location.

119.    The Wyndham Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. The standards that the Wyndham Defendants imposed on the franchisees:

   a.   did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used; and

   b.   covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

c.  dictated the specific manner in which Franchisee Defendant and their respective hotel staff must carry out most day-to-day functions; and

d.  significantly exceeded what was necessary for Wyndham to protect its registered trademarks.

120.  In addition to the ways described above, upon information and belief, Wyndham Defendants exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendant's day-to-day operation of the Subject Ramada. The ways that the Wyndham Defendants exercised this control include:

a.  Wyndham Defendants required franchisees and management of franchised hotels to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Wyndham to protect its registered trademarks;

b.  Wyndham Defendants maintained a team of regionally based trainers to provide training at branded hotels. Wyndham provided training for hotel management and select hotel staff on-site and at locations selected by Wyndham;

c.  Wyndham Defendants provided hotels staff with training it created through an online learning platform, Wyndham University, it controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

d.  Wyndham Defendants controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e.  Wyndham Defendants retained sole discretion to determine whether all training had been completed satisfactorily;

f.  Wyndham Defendants maintained oversight in hiring, disciplining, and terminating hotel management and employees;

g.  Wyndham Defendants required franchisees to participate in mandatory centralized services for day-to-day operation of the hotels;

h.  For certain products and services that franchisees were required to purchase to operate the property, Wyndham Defendants designated approved vendors and prohibited franchisees from purchasing goods and services from anyone other than an approved vendor;

i. Wyndham Defendants required franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at the hotels through direct access to the system;

j. Wyndham Defendants set required staffing levels for the subject property;

k. Wyndham Defendants established detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

l. Wyndham Defendants set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

m. Wyndham Defendants provided benefits for employees of franchised hotels;

n. Wyndham Defendants controlled channels for guests to report complaints or provide feedback regarding the subject property and directly participated in the response and/or supervised and the response to customer complaints or other feedback. Wyndham retained the right to provide refunds or other compensation to guests and to require Franchisee Defendant to pay associated costs;

o. Wyndham Defendants generated reports and analysis of guest complaints and online reviews for the subject property;

p. Wyndham Defendants set detailed requirements for insurance that Franchisee Defendant must purchase;

q. Wyndham Defendants exercised or retained control over the franchisees' day-to-day accounting and banking practices;

r. Wyndham Defendants regularly audited the books and records of Franchisee Defendant;

s. Wyndham Defendants conducted frequent and unscheduled inspections of the subject property;

t. Wyndham Defendants retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if franchisees violated any of Wyndham' detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the subject property;

u.  Wyndham Defendants controlled all marketing for the subject property, directly provided marketing services, and prohibited Franchisee Defendant from maintaining any online presence unless specifically reviewed and approved by Wyndham;

v.  Wyndham Defendants exercised or retained control over all aspects of building and facility design;

w.  Wyndham Defendants imposed detailed recordkeeping and reporting requirements on Franchisee Defendant regarding virtually all aspects of hotel operations;

x.  Wyndham Defendants supervised and controlled day-to-day operations of the subject property through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee Defendant to use;

y.  Wyndham Defendants required the franchisees and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis; and

z.  Wyndham Defendants retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

121.  The Wyndham Defendants had the right to and did enforce its control over Franchisee Defendant through various methods, including:

- the right to conduct detailed inspections of the subject property;

- monitoring or auditing the Franchisee Defendant for compliance with policies and expectations;

- directing Franchisee Defendant to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

- mandating training and education for franchisees and/or hotel staff;

- employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

- the right to impose fines or penalties;

- the right to impose additional conditions on franchisees or to restrict or limit its right to provide goods and services; and

- the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

122.    The Wyndham Defendants are also vicariously liable for Franchisee Defendant and the hotel staff because, as further described above, they retained and exercised control over the specific instrumentalities and aspects of operations that caused Jane Doe (J.T.A.)'s harm, including but not limited to reservations of rooms, hotel security, and detection of and response to suspected sex trafficking. They Wyndham Defendants had the right to exercise detailed, day-to-day control over and involvement in these areas. It also regularly and closely monitored these areas.

## VII.    Defendants are Jointly and Severally Liable for Jane Doe (J.T.A.)'s Damages.

123.    The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (J.T.A.).

124.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (J.T.A.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA

125.    Jane Doe (J.T.A.) incorporates all other allegations.

## I.    Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee)

126.    Jane Doe (J.T.A.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

127.    Franchisee Defendant is a perpetrator within the meaning of 18 U.S.C §1595(a) because they:

a.    violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals (including Jane Doe (J.T.A.))

knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at the Subject Ramada.

b. violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at the Subject Ramada.

128.    Violations of 18 U.S.C §1595(a) by Franchisee Defendant as "perpetrator" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (J.T.A.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Subject Ramada.

**II.    Cause of Action: Beneficiary Liability under §1595(a) of the TVPRA (all Defendants)**

129.    Jane Doe (J.T.A.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

130.    Through acts and omissions described throughout this Complaint, Franchisor Defendants and Franchisee Defendant received a financial benefit from participating in a venture with traffickers, including Jane Doe (J.T.A.)'s traffickers, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe (J.T.A.)'s traffickers, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, Franchisor Defendants and Franchisee Defendant are liable as a beneficiary under 18 U.S.C §1595(a).

131.    Through the acts and omissions described throughout this Complaint, Franchisor Defendants received a financial benefit from participating in a venture with its respective franchisee regarding the operations of its respective hotel properties even though Franchisor

Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

132.    Violations of 18 U.S.C §1595(a) by Wyndham Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (J.T.A.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel property.

### III.    Cause of Action: Vicarious Liability for TVPRA Violations (Franchisor Defendants)

133.    Franchisee Defendant acted as the actual agents of Wyndham Defendants when operating the Subject Ramada. The agency relationship between Franchisee Defendant and each Wyndham Defendant lasted for the period during which the Wyndham Defendants were involved in operation of the Subject Ramada through its role as franchisor.

134.    Through the acts and omissions described throughout this Complaint, each Wyndham Defendant, at the relevant time, exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee Defendant to operate the Subject Ramada.

135.    Under the TVPRA and the federal common law, a principal is vicariously liable for the violations of its actual agent and its subagents.

136.    As a result of the relationship between Franchisee Defendant and Wyndham Defendants, Franchisors are vicariously liable for the acts of Franchisee, including at the Subject Ramada. Factors that support this allegation are that Franchisors shared profits, standardized employee training, standardized and strict rules of operations, Franchisors controlled pricing and reservations, regularly conducted inspections, operational support and control, and other acts described above. Finally, Franchisors had the right to terminate any franchisee that failed to

50

comply with the requirements promulgated by Franchisors. Thus, Franchisors retained control, or the right to control, the mode and manner of work contracted for.

137.    Each Defendant's failure to train and supervise their agents and employees, which was unreasonable in light of the known risk of sex trafficking at the Subject Ramada, enabled and contributed to the sex trafficking of Jane Doe (J.T.A.).

138.    As alleged above, Wyndham Defendants are directly liable to Jane Doe (J.T.A.) for violations of the TVPRA as a beneficiary under 18 U.S.C §1595(a). Wyndham Defendants are vicariously liable to Jane Doe (J.T.A.) for those same violations.

## TOLLING OF LIMITATIONS

139.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (J.T.A.) invokes the discovery rule. At the time she was harmed and through at least the end of 2015, Jane Doe (J.T.A.) was under the coercion and control of traffickers who beat her, threatened her, psychologically abused her, exercised coercive control over her, and severely restricted her freedom.  As a result, Jane Doe (J.T.A.) lacked the information and capacity to understand her injuries and their legal causes.

140.    Thus, Jane Doe (J.T.A.) did not discover and could not reasonably have discovered the legal cause of her injury more than ten years before she filed this lawsuit. While she was under the control of her traffickers, Jane Doe (J.T.A.)—through no fault of her own—lacked the information and understanding to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of Jane Doe (J.T.A.) being kept under the control, coercion, and manipulation of her traffickers, which Defendants facilitated.

141.    At the time Jane Doe (J.T.A.) was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being "trafficked"

at Defendants' hotel or that she was a person "trafficked", much less that she was the "victim" of a legal venture involving defendants, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

142.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (J.T.A.) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe (J.T.A.) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Jane Doe (J.T.A.) filed this lawsuit.

143.    While under the control of her traffickers through at least the end of 2015, Jane Doe (J.T.A.) did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. Jane Doe (J.T.A.) could not have pursued her claims while under the active control of her traffickers despite the exercise of ordinary diligence.

144.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (J.T.A.) also invokes the continuing violation doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants, individually and in concert, across the subject location.

145.    Jane Doe (J.T.A.) was subject to trafficking at the Subject Ramada through at least the end of 2015, which is not more than 10 years before Jane Doe (J.T.A.) filed this lawsuit.

146.    This continuous trafficking resulted from Defendants' facilitation of trafficking at the Subject Ramada and Defendants' ongoing ventures with one another and with criminal traffickers at that hotel.

**DAMAGES**

147.    Defendants' acts and omissions, individually and collectively, caused Jane Doe (J.T.A.) to sustain legal damages.

148.    Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (J.T.A.).

149.    Jane Doe (J.T.A.) is entitled to be compensated for personal injuries and economic damages, including:

    a.  Actual damages (until trial and in the future)

    b.  Incidental and consequential damages (until trial and in the future);

    c.  Mental anguish and emotional distress damages (until trial and in the future);

    d.  Lost earnings and lost earning capacity (until trial and in the future);

    e.  Necessary medical expenses (until trial and in the future);

    f.  Life care expenses (until trial and in the future);

    g.  Physical pain and suffering (until trial and in the future);

    h.  Physical impairment (until trial and in the future);

    i.  Emotional impairment (until trial and in the future);

    j.  Exemplary/Punitive damages;

    k.  Attorneys' fees; and

    l.  Costs of this action.

    m.  Pre-judgment and all other interest recoverable.

## JURY TRIAL

150.    Jane Doe (J.T.A.) demands a jury trial on all issues.

## RELIEF SOUGHT

151.    WHEREFORE, Jane Doe (J.T.A.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (J.T.A.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (J.T.A.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,

**LOCKS LAW FIRM**

*/s/ Francesca A. Iacovangelo*
Francesca A. Iacovangelo, Esquire
ID No. 022782022
601 Walnut Street, Suite 720 East
Philadelphia, PA 19106
(215) 893-0100
(215) 893-3444 Facsimile
fiacovangelo@lockslaw.com

Attorney for Plaintiff